## P. A. REES ET AL. v. SCHUYL. R. ETC. R. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF PHILADELPHIA COUNTY.

Argued April 11, 1889—Decided June 4, 1890.
[To be reported.]

1. In a proceeding to assess compensation for injuries caused by the location and construction of a railroad, the question whether one date or another is the proper one, as of which the witnesses should estimate the market value, is immaterial when it is undisputed that there was no change in the occupation, use, or value of the property between the two dates.

(*a*) An ice company's storage house was in part destroyed by the construction of a railroad. The railroad company and the ice company agreed that the former should erect a new ice-house, and that the latter might take it at cost, allowing the same " as an offset to the damages awarded to them," this agreement not to prejudice the rights of either party.

(*b*) It was further agreed that if the ice company should regard the bill for the cost of the house as excessive, experts should be appointed to fix its just cost and decide whether said company's business could conveniently be carried on in it. The ice company accepted the house when built, and used it, without disputing the bill for its cost:

2. Upon the assessment of damages for the construction of the railroad, it was proper to show that the use of the house in the ice business was inconvenient and expensive, not by reason of defective construction

of the house, but in consequence of the presence of the railroad track, and that the value of the property was depreciated by such inconvenience.

3. The cost of erecting the new ice-house being a stipulated offset to the damages sustained by the plaintiffs, an instruction directing the jury to deduct the same from the damages assessed by them and to render a verdict for the difference, was neither a substantial nor a technical error.

4. When a certain method of proving a claim for damages has been adopted at the suggestion of the defendant, who is afforded ample opportunity for cross-examination as to the nature and amount of the items making up the claim, the defendant will not be permitted to complain that the method so adopted was an improper one.

Before Green, Clark, Williams, McCollum and Mitchell, JJ.

No. 248 January Term 1889, Sup. Ct.; court below, No. 429 March Term 1887, C. P. No. 2.

On April 28, 1887, upon petition of the Schuylkill River East Side Railroad Company, the court below appointed viewers to assess the damages, if any, arising to P. Ashman Rees and others by reason of the location and construction of said company's railroad upon and across a certain lot of ground in Philadelphia. On June 18, 1888, the viewers reported awarding damages to the landowners, and on July 9, 1888, the railroad company appealed from the award. By amicable agreement, filed on September 20, 1888, an issue was framed between P. Ashman Rees and others, plaintiffs, and said railroad company, defendant, to determine what damages, if any, the plaintiffs were entitled to receive in the premises.

At the trial, on November 26, 1888, the following facts were shown:

In 1881 the plaintiffs became the owners of the property in question, which is situated between Sutherland Avenue and the Schuylkill river, having a width of about 100 feet and a depth of about 424 feet. Between 1877 and 1881 they were in possession of it under a lease, with an option to purchase, and expended considerable sums of money in putting up valuable permanent improvements for the purpose of adapting it to their business. Their principal business was the selling of ice in Philadelphia which they brought in vessels from Maine, and

which, by reason of their river frontage, they were enabled to unload upon their own property. They dealt also in coal and lumber. The partnership articles between the plaintiffs, under which the ice business was conducted, were to expire in 1891.

In August, 1886, the defendant company entered upon the plaintiffs' property for the purpose of constructing its roadbed thereon. The testimony for the defendant tended to show that a location through the property had been made in August, 1883; that the agent of the defendant delivered to the plaintiffs, on August 23, 1883, a plan showing such location, and that, while changes in the location were subsequently made, the actual construction through the plaintiff's property was substantially upon the line surveyed in 1883. The testimony for the plaintiffs tended to show that they did not know what the final location was until August, 1886. It was shown also, that the consent of the city councils to the construction of the railroad was not obtained until July 3, 1885. The testimony tended to show that there was no variation in the value of the plaintiffs' property between 1881 and 1886.

A large ice-house stood upon the lot, directly in the line of the railroad. Before the work of construction of the railroad began, the railroad company and the plaintiffs entered into a written contract by which the company agreed to erect a temporary ice-house upon another site, the plaintiffs to have the right, in case they and the company should make arrangements by which the existing wharf could be occupied for the purposes of the plaintiffs' business, to take said ice-house, allowing its cost " as an offset to the damages awarded to them." The agreement provided, also, that if the plaintiffs should believe the bill for the cost of the new ice-house to be excessive, they should name an expert, and the railroad company should name another, and said experts should fix the just and proper cost of the building and decide whether the business of the plaintiffs could conveniently be carried on in the house as erected by the railroad company; in case of their disagreement, the finding of a third expert mutually chosen, to be conclusive. It was further stipulated that this arrangement was a temporary expedient to enable the plaintiffs to continue their business, and that it should be without prejudice to the rights and claims of either party.

### Statement of Facts.

The railroad company thereupon erected a new ice-house at a cost of over $13,200. The plaintiff accepted and used the new ice-house, and an arbitration as to its value or convenience was never suggested. The testimony for the plaintiffs tended to show that its value, as an ice-house, was no greater than that of the old one. Testimony for the defendants tended to show that the old ice-house was worth not more than $6,000, and that after its destruction in part by the railroad company, the portion of it that remained was worth $2,000.

P. Ashman Rees, one of the plaintiffs, testified on their behalf as follows:

Q. How long was it before the railroad company quit their work upon your wharf under that agreement?

Mr. Addicks: We object to anything touching the construction of the ice-house under the agreement. In the first place, the agreement specifically states that all matters in relation to the construction of that ice-house and its adaptability to the business shall be considered by a special tribunal.

Mr. Johnson: We only want to know how long the time was, and the extent of the interference with the business.

Mr. Addicks: I insist upon the objection.

By the court: Objection overruled; exception.[1]

A. It was about the first of the following April, 1887. It wasn't finished then. . . . . Q. Since the occupancy of your wharf by the railroad company has it been in such a condition as would permit the carrying on there of the coal business?

Objected to.

By the court: Objection overruled; exception.[2]

A. No sir.

Q. Did or did not the construction of the railroad across your wharf, during its construction, alter the adaptability of your wharf for the conduct of your ice business?

Objected to.

Mr. Johnson: We offer to prove by this witness that the railroad company consumed a considerable period of time in the construction of their road; that, during the period, the business of the petitioner could only be conducted by making a very considerable additional outlay, necessitated solely by its construction, and the extent, nature, and amount of such outlay.

Statement of Facts.

Mr. Addicks: We object as to the form in which the offer is made. Your honor will notice that the offer is not to show by the witness that, as the direct result of the exercise of the power of eminent domain, such loss or expense was incurred. It is an attempt to show a special method of carrying on the business, which they aver was an expensive method. There might have been a less expensive way, or it might have been better to have stopped. They may have made an error in judgment, for which we would not be responsible.

By the court: I understand the offer to be to show that during the time the railroad was under process of construction additional outlays were necessary to enable the plaintiffs to carry on their business. Do you object to that offer?

Mr. Addicks: We do.

By the court: I sustain the offer, and overrule the objection; exception.[3] [4]

Q. During the time that the railroad was in the course of construction, were you, or were you not, subjected to additional necessary outlays in the conduct of your business? A. Yes, sir. Q. From the 16th of August, 1886, have you any memorandum of the expenses to which you were subjected by reason of the occupancy of your wharf and the construction of your wharf? A. Yes, sir. Q. Have you that in a book? A. Yes, sir; the book is here. (Producing same.)

The defendant's counsel objected to the proof of the items of damages by the use of this book, and suggested that the witness state, if the plaintiffs suffered any damage, what the damage was.

The witness then testified that the plaintiffs were subjected to additional expense in their business, during the construction of the railroad, through being compelled to employ additional men, and to buy a new boiler, planking, spikes, etc., and that the aggregate amount of this extra expense was between $10,000 and $13,000. He was subsequently cross-examined as to the items making up these expenses. After having testified that he had been in business on the Schuylkill wharves for twenty years; that he had knowledge of the market value in 1886 of wharves in the vicinity of the plaintiffs' property; that before its purchase he had endeavored to buy an adjoining wharf and had inquired its price; that he had made an effort

Statement of Facts.

to acquaint himself with the wharves that were then for sale, and that from 1880 to 1886 there was but one wharf sold in that neighborhood besides that of the plaintiffs, the witness was asked to state the market value of the plaintiffs' property, including machinery, fixtures and other appurtenances of the real estate, in August, 1886.

Objected to.

By the court: Objection overruled; exception.[6]

A. $75,000 to $80,000.   Q. How much, in your judgment, did the railroad construction decrease the market value of the property which you valued at $75,000 or $80,000?   A. One half. . . . .   Q. When the railroad entered on your property, did you or did you not consider the question of how you could best adapt it so as to make the most money?

Objected to.

By the court: Objection overruled; exception.[7]

A. Yes, sir.   Q. Did you make certain changes in your property or not?   A. Yes, sir.   Q. In your judgment, were those changes, or were they not, advantageous with a view to making the best and most valuable use of the property?

Objected to.

By the court: Objection overruled; exception.[8]

Q. With the improvements that you have made, or with the improvements that could have been made, with that construction, can the ice business be carried on now just as well and as cheaply as it could before?

Objected to.

By the court: Objection overruled; exception.[16]

A. No, sir.   Q. Why not?

Objected to.

By the court: Objection overruled; exception.[16]

The witness then explained that in unloading and storing it, the ice had to travel further from the vessel to the ice-house than formerly, and was more exposed to the sun, and, by reason of having four elbows or turns in the run, it was more subject to waste from breakage; and he estimated the extra percentage of waste at from three to five per cent upon the total tonnage.

Frederick S. Rees, one of the plaintiffs, testifying on their behalf, was asked:

Statement of Facts.

Q. Please state first whether you know what is the best use to which that property could be put, at the time of the railroad's construction, with reference to its market value.

Objected to.

By the court: Objection overruled; exception.[21]

A. No sir; I do not know.

John G. Matsinger, called by the plaintiffs, testified that he had tried to buy a certain wharf upon the Schuylkill, and in that connection had looked along the river and found that the property he tried to buy was the most valuable one there for his purpose; that he thought himself sufficiently familiar with the values of wharf properties in that locality to buy one without consulting any one else as to the price; that he knew of but one sale of a wharf that had taken place between 1877 and 1886, that sale being in 1885, but he knew that the railroad company had bought several properties in the neighborhood. He was then asked:

Q. Leaving out of the question the value of the business and the depreciation, if any, on stock and carts, taking that wharf, with its improvements and the buildings upon it, as it was used before the railroad company entered upon it, what, in your judgment, was it worth? I mean the real estate, with the machinery connected with it; everything except the business, carts, wagons and horses.

Objected to.

By the court: Objection overruled; exception.[31]

A. I shouldn't think it would be worth one half of what it was before. Q. What do you think it was worth before the railroad entered, in your judgment? A. I should judge that property, with the stable and ice-house and machinery on it, as it was, would be worth about $65,000 or $70,000. Q. Do you think it was worth that to any person who wanted the property? A. Yes, sir; that is, for that business. . . . . Q. If coal were stored there with a view to being sold in the market, and got over that right-of-way, how would it, in your judgment, have to be got over in safety?

Objected to.

By the court: Objection overruled; exception.[32]

A. There is only one way in which it could be got over in safety. That would have to be done with a bridge. Q. In

your judgment, as that wharf was left by the railroad company, could or could not the coal business be transacted there in connection with the ice business on that property?   A. No, sir; there is not room.   Q. How about the lumber business? A. There is not room for that.   Q. You have spoken about the loss of available space, and not being able to do these businesses. Come down now to the practical carrying on of the ice business.   Can that be conducted as economically now as it could be before the railroad company came there?

Objected to.

By the court: Objection overruled; exception.[33]

A. No, sir.   Q. I do not ask you for the difference in figures, but state to the jury in what respects the ice business can no longer be done as economically as before?

Objected to.

By the court: Objection overruled; exception.[33]

A. Because the house is so much farther off than it was before.   Then we have to take ice from the vessel and run it down a chute into a conduit, and take it up that way, taking it underneath the railroad through that conduit, and then up the chute. We have two chutes; one to the platform, and one elevated. Q. Does that lead to more or less wastage of ice than the old plan?   A. To more, of course, because it has to go that much farther.   Q. How about the turns in it increasing wastage or not?   A. Turns around cause considerable breakage.   We have such a short space of ground that we have to come up almost straight, you might say, and the ice falls off of these hold-bars, as we call them, that are attached to the chain, and goes down and mashes one cake after another.

Mr. Johnson: You have seen the manner in which ice is handled there, by the present device, from the boat into the ice-house, have you not?   A. Yes, sir.   Q. You have seen them working?   A. Yes, sir.   Q. You have had practical experience in the business of handling ice?   A. Yes, sir.

Q. Is the device that they have adopted as good and economical a one as could be adopted, or is there some better device?

Objected to.

By the court: Objection overruled; exception.[34]

The witness: It is as good as they could get. . . . . Q. Does the necessity of carrying on that business, by reason of a con-

Charge of Court below.

duit under the railway, affect the salable market value of that property as compared with property where no such necessity exists?

Objected to.

By the court: Objection overruled; exception.[35]

A. Certainly it does.

Witnesses called by the defendants testified that in their judgment the plaintiffs' property was enhanced in value by the location and construction of the railroad, in view of the advantages and facilities thereby afforded. Henry M. Boyd, one of these witnesses, was asked upon cross-examination:

Q. Wouldn't you say, even as an expert, that if it required three more men to land the ice, and double the quantity of coal, and led to waste of a thousand tons of ice a year, that there was a serious interference with the value?

Objected to.

By the court: Objection overruled; exception.[40]

A. I should say yes; that that was a serious damage.

At the close of the testimony, the court, FELL, J., charged the jury in part as follows:

The claim of the plaintiffs is this, that the market value of their property has been depreciated by the construction of the railroad: 1. By the loss of space by reason of the ground actually taken. 2. That the capacity of the property for business purposes has been decreased to a large extent by the division into two parts which here become practically distinct by reason of the danger of crossing the railroad tracks, or the impracticability of so doing; that by reason of this the western end of the lot has become of little or no value for storage purposes, both because of its contracted size and its separation from the rest, and from any street or roadway. 3. Because of the additional expense necessarily incurred in the management of any business upon this property, by reason of the maintenance of the conduit, the additional force of men required, the greater steam power required, and the longer distance to which merchandise delivered at the dock must be removed. 4. Because of the loss which resulted from the use of the conduit or passageway in breakage and injury to merchandise moved along it.

Another element of loss has been referred to in the testimony.

Charge of Court below.

The necessary additional expense incurred by the plaintiffs during the period of construction, and before the permanent change in buildings and machinery was completed, in order to conduct their business and guard their property. These include the erection of temporary platforms, of hoisting, rigging, planking, and materials of that nature ; the purchase of a new boiler, the overhauling of an engine, and extra watchmen, because their place was open and their property exposed ; and extra workmen made necessary for the ordinary management of their business during this period owing to the obstructions, want of access from one part of the place to another, and deprivation of the use of part of the property.

These are the claims of the plaintiffs, and as such only I refer to them. How well they have been established by the testimony offered, is a question entirely for your consideration. . . . .

Although it has been a subject of contention, I believe there is no evidence showing that the mere location affected the value of the property in any way ; that is, that there is any difference in value between the time of location and of actual occupation.

The general advance or decline in price because of the projection or building of this road, which this property shared with all other properties in the immediate vicinity, is not to be considered. The value of the property to the plaintiffs, because of their business being there, or for any reason peculiar to themselves, is not to be considered ; but its market value, its value for any purpose to which it could be put, and to any person.

You will then determine from the testimony what the market value of this property was before it was affected by the railroad, and what the market value of the property was after the completion of the railroad. The difference, if any, is the measure of damages as to the real estate. . . . .

This property is valuable mainly for business purposes. This value is increased by the fact, and before was largely dependent upon it, that it is on the river, and has the facilities for transportation by water. The dock is of unusual depth, admitting of the unloading of large vessels. The substance of the plaintiff's testimony upon this point is, that, with the best

Charge of Court below.

business appliances to make the property available for use, the depreciation in market value is from $32,500 to $40,000; that the loss occasioned during the construction of the road was from $10,000 to $13,000.

The defendants have called a number of witnesses who have given their opinion as to the effect of the railroad upon the market value of the property. . . . . All these witnesses are of the opinion that the additional facilities for transportation by rail add to the value of the property and more than compensate for the loss of area and all other disadvantages.

You then have this condition of things presented by the testimony upon this point. The plaintiff's witnesses estimate the loss at from $32,500 to $40,000. The defendant's witnesses agree in the statement that there is no injury, and that the additional facilities for transportation compensate for the loss of ground. . . . .

You are not bound to accept any of these opinions as to value, expressed by any of the witnesses on either side of the case. You will use them for what you believe they are worth in forming your own judgment. In arriving at a conclusion you will remember that it is the market value you are to consider; market value for any use to which it can be put. And in arriving at that you will consider, in connection with the disadvantages that you may find the property is subjected to, any advantages which have been brought to it.

[There is but one other subject to which I desire to call your attention. On August 10, 1886, before the railroad entered upon the property, an agreement was made between the plaintiffs and defendant in relation to the construction of an ice-house. The removal of the old ice-house was necessary; and, in order to avoid any unnecessary loss to either party, it was agreed that the railroad company should erect a new ice-house. This house, if the plaintiffs gave up the use of the wharf for the ice business, was to become the property of the railroad; but if they remained and continued in the business, the total cost of erecting it was to be deducted from any award by a jury assessing damages. The cost of erecting that ice-house was $13,200. This you must now take into consideration. If, in estimating the value of the property before the occupation of the railroad, you include the value of the old house, you will then de-

Arguments.

duct the total amount expended for the new one. If you do not include the old house in your estimate, and find that the new house is worth more than the old one in its effect upon the market value, you will deduct the excess in value. If these houses were equal in their effect upon the market value of the whole property, then there is nothing to deduct.] [43]

—Exception was taken to the charge as follows:

" Mr. Cassidy, for defendant, excepted to that part of the charge of the court referring to the contract of August 10, 1888, enclosed in brackets. Exception noted by the learned judge, not upon any ground of inaccuracy of statement but because it is a subject with which the jury have nothing to do."

The jury rendered a verdict in favor of the plaintiffs for $42,500. A rule for a new trial was afterward discharged, upon condition that the plaintiffs file a remittitur of all the verdict in excess of $35,000. Subsequently, the plaintiffs having complied with this condition, judgment was entered in their favor, whereupon the defendant took this appeal, assigning for error:

1–4. The admission of plaintiffs' offers.[1 to 4]
6–8. The admission of plaintiffs' offers.[6 to 8]
16, 21. The admission of plaintiffs' offers.[16 21]
31–35. The admission of plaintiffs' offers.[31 to 35]
40. The admission of plaintiffs' offer.[40]
43. The part of the charge embraced in [ ] [43]

*Mr. William H. Addicks* (with him *Mr. Lewis C. Cassidy*), for the appellant:

1. The permanent location of a railroad is an appropriation of the land embraced within the location to public use, fixes the date of the legal inquiry, and vests a right of action for all the damages, both those incident to the location and those to result from the subsequent construction: Pittsb. etc. Ry. Co. v. Commonwealth, 101 Pa. 192; Neal v. Railroad Co., 31 Pa. 19; Wadhams v. Railroad Co., 42 Pa. 310; Heise v. Railroad Co., 62 Pa. 67; Beale v. Railroad Co., 86 Pa. 509; Davis v. Railway Co., 114 Pa. 314; Lafferty v. Railroad Co., 124 Pa. 297. It likewises fixes the responsibility of the railroad company to the general public: Pittsb. etc. Ry. Co. v. Common-

Arguments.

wealth, 101 Pa. 192; and its rights as against other railroad companies: New Brighton etc. R. Co. v. Railroad Co., 105 Pa. 13; Davis v. Railway Co., 114 Pa. 312. Purchasers or tenants, taking subsequent to the location, take subject to the easement and have no right to damages: Campbell v. Philadelphia, 108 Pa. 300; Tenbrooke v. Jahke, 77 Pa. 392; Turnpike Road v. Brosi, 22 Pa. 29; Davis v. Railway Co., supra. As the plaintiffs had notice of the location in August, 1883, and the right to construct, so far as the municipal ordinance was concerned, was perfected in July, 1885, testimony as to the value of the property in August, 1886, as the basis for assessing damages, was irrelevant and misleading. The valuation should be as of the date when compensation could first be demanded: Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 411; Pittsb. etc. R. Co. v. McCloskey, 110 Pa. 436; Setzler v. Railroad Co., 112 Pa. 56.

2. The testimony admitted for the plaintiffs all related to a valuation of the land in connection with a particular business, the peculiar state of that business and the special appliances in use in it. This method of showing damages is contrary to the settled rule: Schuylkill Nav. Co. v. Thoburn, 7 S. & R. 410; Philadelphia v. Linnard, 97 Pa. 242; Penna. R. Co. v. Eby, 107 Pa. 166; Pittsb. etc. R. Co. v. Patterson, 107 Pa. 464; Setzler v. Railroad Co., 112 Pa. 56. As to the ice business, the partnership articles between the plaintiffs expire in 1891, and the appliances connected with that business have no just relation to the permanent value of the real estate. The theory of assessing a permanent injury to the land upon the basis of the relative efficiency of certain machinery employed in a business that must end within a few years, is likely to lead to the unjust results pointed out in Pittsb. etc. R. Co. v. Patterson, 107 Pa. 464. It is simply a way of working into the case an estimate of a loss of future business profits. The reduction of the value of the real estate on account of an alleged waste in handling ice, was introducing a speculative element which is improper: Pittsb. etc. R. Co. v. McCloskey, 110 Pa. 436; Setzler v. Railroad Co., 112 Pa. 56. Especially should such a reduction, upon the basis of a waste continuing forever, not be allowed, when it appears that the ice business is to end in 1891.

3. By the contract of August 10, 1886, the parties set up

Arguments.

a special tribunal to finally decide the question whether the business of the plaintiffs "could conveniently be carried on in the house as erected by the railroad company," agreeing that the just cost of the house, as fixed by that tribunal, should be deducted from any award, and that the contract should not be used to the prejudice of either party in the trial of this cause. It was error to permit the question referred to, to be submitted to the jury, such submission being inconsistent with the express provisions of the contract. The jury had nothing to do with a comparison between the value of the old ice-house and that of the new, or with the question whether anything should be deducted for the cost of the latter. They should have made their assessment without reference to the contract, and the deduction should have been made subsequently. And it was error to permit any reference to be made to buildings or other improvements erected on the land, subsequent to the taking, to establish the value of the property as affected by the taking: Philadelphia v. Linnard, 97 Pa. 242. And P. Ashman Rees and John G. Matsinger were not competent witnesses upon the subject of values, their knowledge on the subject appearing to be based entirely upon hearsay: Pittsb. etc. Ry. Co. v. Vance, 115 Pa. 325; and it was clear error to permit Frederick S. Rees, after being held incompetent upon the question of market value, to be asked as to the best use with reference to market value. Moreover, the plaintiffs should not have been permitted to charge a lump sum of $10,000 to $13,000 for expenses during construction, and this charge was not established by sufficient competent evidence.

*Mr. John G. Johnson* (with him *Mr. A. M. Beitler*), for the appellees:

Counsel cited as to the measure of damages: Setzler v. Railroad Co., 112 Pa. 56; Philadelphia v. Linnard, 97 Pa. 242; East Penna. R. Co. v. Hottenstine, 47 Pa. 28; O'Brien v. Railroad Co., 119 Pa. 184. As to proof respecting improvements subsequent to the location of 1883: Lafferty v. Railroad Co., 124 Pa. 297; Gilmore v. Railway Co., 104 Pa. 281. As to considering the use to which the property was applied: Pittsb. etc. Ry. Co. v. Vance, 115 Pa. 325; West. Penna. R. Co. v. Hill, 56 Pa. 460; Penna. etc. R. Co. v. Keller, 20 W. N. 125;

Opinion of the Court.

Setzler v. Railroad Co., 112 Pa. 65; Pittsb. etc. R. Co. v. Patterson, 107 Pa. 461; Philadelphia v. Linnard, 97 Pa. 247; Penna. etc. R. Co. v. Bunnell, 81 Pa. 427; Shenango etc. R. Co. v. Braham, 79 Pa. 447; Pittsb. etc. R. Co. v. Rose, 74 Pa. 369; Wilmington etc. R. Co. v. Stauffer, 60 Pa. 374. As to competency of witnesses respecting market value: Pittsb. etc. Ry. Co. v. Vance, 115 Pa. 325; Pittsb. etc. R. Co. v. Robinson, 95 Pa. 426; Penna. etc. R. Co. v. Bunnell, 81 Pa. 425; Pittsb. etc. R. Co. v. Rose, 74 Pa. 368; White D. Cr. Imp. Co. v. Sassaman, 67 Pa. 415; Hartman v. Railroad Co., 22 W. N. 84.

OPINION, MR. JUSTICE McCOLLUM:

There is no merit in the several specifications of error which relate to the admission of evidence of the value of the plaintiffs' property in August, 1886. It was then that the defendant company entered upon the premises, and that the plaintiffs first learned of its determination to construct its railroad there. There was nothing upon the ground to indicate a prior permanent location of such road, and there was no act of the defendant company, within the knowledge of the plaintiffs, which amounted to an appropriation of their property. After the plaintiffs had closed their case, some evidence was given by the company of a location in 1883, a plan of which, so far as it related to the plaintiffs' property, was then delivered to them; but in this location changes were subsequently made, and municipal consent to the construction of the railroad was not obtained until July, 1885. It was shown by the plaintiffs, and not controverted by any evidence in the cause, that there was no change in the occupation, use or value of the property from 1881 to the entry for construction in August, 1886. It was purchased by the plaintiffs under an option secured by them in 1877, when there was great depreciation in the real-estate market, and, as it stood in 1881, it had cost them $46,500. Its market value after the railroad was constructed upon it did not exceed $40,000, and the defendant company's evidence was to the effect that it was worth that sum before the alleged location, in 1883. The learned judge correctly said in his charge to the jury that there was no evidence showing "any difference in value between the time of location and of actual occupation," and he might have added that, upon the undisputed

evidence, there was no difference. In view of the facts recited, and distinctly appearing in the record, the question raised by the specifications mentioned is immaterial, and requires no further consideration in this case.

It is claimed that there was error in the admission of the evidence, and in the charge of the court, relating to the ice-house constructed by the defendant company under the contract of August 10, 1886. If the plaintiffs continued the business in which they were then engaged on the premises in question, they had an option, under this contract, to take the ice-house at its cost, to be allowed " as an offset to the damages awarded to them ;" and, if they believed the company's bill for construction was excessive, they were at liberty to select an expert, who, with the expert to be named by the company in such case, should fix the just and proper cost of the building, and decide whether the business could be conveniently carried on in the same. The plaintiffs did not believe or claim that the company's bill was excessive, and there was therefore no occasion or authority for the appointment of experts. They conceded that the ice-house was well adapted to the business for which it was constructed, and that it was the best that could be devised for that purpose, with the railroad upon the premises. The evidence did not criticise or condemn any work done by the company under the contract, and it did not call in question the efficiency of any device or apparatus erected or paid for by the company, or used in carrying on the business. It did not relate to an inconvenience arising from defective or imperfect work or appliances, but to an inconvenience in the use of the property, caused by the construction of the railroad upon it. It had no reference to matters which, in a certain contingency, were to be passed upon by experts appointed by the parties. It was relevant to the issue, and properly admitted.

The cost of the ice-house was made by the contract under which it was built an offset to the damages sustained by the plaintiffs by the location and construction of the railroad upon their property. It was so applied by the tribunal which ascertained and awarded them. The verdict represents the damages, less the cost of the new ice-house, and the company has the credit for which it stipulated. We are not prepared to say that it was substantial, or even technical, error to allow the jury

Opinion of the Court.

which assessed the damages to apply an admitted set-off in reduction of them. An exception was noted to the charge, not because of any inaccuracy of statement, but distinctly upon the ground that the set-off was not a proper matter to be considered by the jury. The specification of error, however, goes beyond the exception taken when the charge was delivered, and it is now contended that the instructions on this subject were incorrect. But, waiving this irregularity, we think the charge, fairly interpreted, was unobjectionable. It contained a positive direction to the jury to deduct from the damages the total amount expended for the new ice-house. This amount was fixed by the litigants, and the whole duty of the jury, in this particular, was to give the company credit for it.

The defendant company did not dispute the claim of the plaintiffs to be reimbursed the additional outlay necessarily incurred in their business whilst the railroad was in process of construction, and it cannot justly complain of the form of the proofs on this subject, because that was finally adopted upon its own suggestion. P. Ashman Rees, one of the plaintiffs, testified to the nature of this outlay, and presented a memorandum, which he read, of the items of it, as they accrued from day to day, and ample opportunity was afforded for cross-examination as to them.

We think P. Ashman Rees and John G. Matsinger were qualified and competent to testify to the market value of the property, and that the question to Frederick Rees was harmless, because he answered that he did not know. We find nothing on this record which calls for a reversal of the judgment.

The judgment is affirmed.

On October 20, 1890, a motion for a re-argument was refused.