## Schuldice, Appellant, *v*. City of Pittsburgh.

*Municipalities—Indebtedness—Funding bonds—Vote of people —Calculation of debt—Bonds owing by bridge company—Damages for change of grade of streets—Judgments for personal injuries— Disputed claims—Assessments for benefits—Sinking fund—Deduction of cash and bonds.*

1. The issuance of bonds by a city for the purpose of funding or refunding a debt previously created and existing is not an increase of indebtedness but is merely a continuation thereof. The fact that the old debt is not instantly paid when the new is created is not material when the proceeds of the new loan are irrevocably pledged to the payment of the old debt.

2. The fact that the people vote to permit the funding of an old debt incurred without their consent does not transfer the debt from the councilmanic to the electoral class.

3. Bonds issued by a bridge company of which the city owns all the stock and has the complete control, are properly counted as a part of the city's debt.

4. The amount of an estimate made by the proper officers of a city as to the cost of changing the grade of a street which has been authorized, and the damages which will be caused property owners thereby, is properly counted as a part of the city's debt; but possible benefits which might be assessed against property owners in such case where any estimate as to the amount of such bene-

fits is necessarily uncertain and speculative, are not grounds for reducing the indebtedness so found.

5. Undisputed liens actually filed against properties benefited are outstanding solvent debts owing the city and as such may be considered as an offset in computing the city's debt.

6. The amount of judgments recovered against a city for damages for personal injuries are properly computed as a part of the city's debt, especially where there is nothing to show that appropriations have been made from current funds sufficient to cover such liabilities during the fiscal year.

7. Unliquidated and disputed claims pending against a municipality are not to be counted as a part of its indebtedness, where all liability upon such claims is denied.

8. In determining the amount of a city's debt, which has been created without vote of the people, only cash in the sinking fund actually paid in for the specific purpose of retiring bonds so authorized, and which cannot lawfully be diverted to any other purpose, and bonds of that class actually owned by the city and held in the sinking fund may be counted as an offset to such indebtedness.   Other securities held in the sinking fund, even bonds authorized by vote of the people, may not be so deducted in computing debt created by authority of councils only.


Argued May 25, 1915.  Appeals, Nos. 133 and 134, Oct. T., 1915, by plaintiff, and the City of Pittsburgh and Joseph G. Armstrong, defendants, from decree of C. P. Allegheny Co., Jan. T., 1915, No. 1348, on bill in equity for an injunction, in case of Charles A. Schuldice, a Taxpayer of the City of Pittsburgh, v. The City of Pittsburgh, a Municipal Corporation of Pennsylvania, and Joseph G. Armstrong, Mayor, Appellants, and E. S. Morris, City Controller of said city.   Before BROWN, C. J., MESTREZAT, POTTER, ELKIN, STEWART, MOSCHZIS-KER and FRAZER, JJ.   Reversed.


Bill in equity to enjoin a municipality from issuing bonds.

Exceptions to the report of J. B. Eichenauer, referee, Before SWEARINGEN, J.

The opinion of the Supreme Court states the facts.

The court dismissed the exceptions. Plaintiffs and defendants appealed.

*Error assigned* was in dismissing the exceptions.

*R. W. Martin,* for Charles A. Schuldice, and *Lee C. Beatty,* for E. S. Morrow, City Controller.

*C. K. Robinson* and *Frederick W. Longfellow,* with them *C. A. O'Brien,* for the City of Pittsburgh and Joseph G. Armstrong, Mayor.

OPINION BY MR. JUSTICE POTTER, July 3, 1915:

This was a bill in equity filed by plaintiff, as a taxpayer and resident of Pittsburgh, against the City of Pittsburgh, Joseph G. Armstrong, its mayor, and E. S. Morrow, city controller, to restrain the issue of four series of bonds, which were authorized without submitting the matter to a vote of the people. The ordinances, in question, provided for the issue of bonds, as follows:

1. Bonds to the amount of $2,760,000, designated "Funding Bonds 1914," authorized by Ordinance No. 389, approved November 14, 1914, which bonds were to be issued to fund a then existing floating indebtedness of the city, due and unpaid.

2. Bonds to the amount of $1,068,000, designated "Street Improvement Bonds, Series A, 1914," authorized by Ordinance No. 388, approved November 13, 1914.

3. Bonds to the amount of $867,000, designated "Improvement Bonds, Series B, 1914," authorized by Ordinance No. 405, approved November 17, 1914.

4. Bonds to the amount of $735,000 designated "Improvement Bonds, Series C. 1914," authorized by Ordinance No. 406, approved November 18, 1914.

The creation of new indebtedness for municipal purposes was authorized by the last three series of bonds. It is only the limit of councilmanic power to create indebtedness which is here in question. The plaintiff alleged that all of the proposed issues are invalid for the

reason that they will increase the councilmanic indebtedness beyond the two per cent. constitutional limit. Separate answers were filed by the city and by E. S. Morrow, the city controller. When the cause was at issue, it was sent to a referee, who held that the first three ordinances named are valid, as according to his calculation, the sums authorized are within the prescribed limit. But the fourth ordinance he held to be invalid, as the increase of indebtedness therein authorized, if added to the amounts of the other three issues, would exceed the two per cent. borrowing capacity of the council, without a vote of the people. Exceptions filed to the report of the referee were dismissed, and the report was confirmed by the court below. Appeals were taken on behalf of the city, and by the plaintiff. As these appeals raise questions intimately interwoven, they were argued together, and both will be disposed of in this opinion.

In the appeal of the city, the first question raised, as stated by counsel, is as follows: whether certain funding bonds consisting of two issues, one of $700,000 and one of $400,000 respectively, issued with the assent of the electors, but which were issued and the proceeds used for the payment of a floating indebtedness incurred prior to such assent, is an indebtedness incurred with or without the assent of the electors within the meaning of the Constitution. It is clear that the obligations which these bonds were intended to replace, were created without the vote of the people, and the authority afterwards granted by the people to fund this existing indebtedness, which had been incurred without their consent, cannot be held to operate to transfer such indebtedness from the councilmanic class to the electoral class. The funding or refunding of a debt previously created and existing, is not an increase of that indebtedness, but is merely a continuation thereof. The referee and the court below were right in the conclusion which they reached, that these bonds represented indebtedness incurred without the vote of the people.

The next question raised on behalf of the city is, whether certain bonds issued by the Monongahela Bridge Company of Pittsburgh, a Pennsylvania corporation, the stock of which is owned by the City of Pittsburgh, are to be regarded as debts of the city. It appears that the City of Pittsburgh acquired the entire capital stock of the bridge company under the provisions of the Act of May 26, 1893, P. L. 154, and the city officials have since acted as officers of the bridge company and have conducted its affairs, and the bonds were issued to pay for subsequent improvements. While it is true that the bridge company continued to exist as a corporate entity: Com. v. Monongahela Bridge Co., 216 Pa. 108; Monongahela Bridge Co. v. Pittsburgh & Birmingham Traction Co., 196 Pa. 25, yet the indebtedness of the bridge company became in effect the indebtedness of the city, its real owner, even though there was no direct liability for the debt on the part of the city. In Point Bridge Co. v. Pittsburgh Rys. Co., 240 Pa. 105, we said, speaking through Mr. Justice STEWART (p. 109): "While the effect of this purchase was not to vest the ownership of the bridge in the city, as was said in Monongahela Bridge Co. v. Pittsburgh & Birmingham Traction Co., 196 Pa. 25, since the bridge company as a corporate entity was not by the purchase extinguished, nevertheless by the purchase the power of absolute control passed to the city, the only stockholder, as trustee for its inhabitants, as completely as though it had been the purchase of the physical structure of the bridge." The referee was fully justified in holding that the issue of Monongahela Bridge Company bonds is to be regarded as indebtedness of the city incurred without the assent of the electors.

The third question raised in the city's appeal, is with respect to the estimated damages caused by the change of a street grade, and the estimated cost of doing the work, which the referee included in computing the indebtedness of the city. An estimate of the amount of

damages to property owners, and the cost of doing the work in question, had been given to the city authorities by the director of the department of public works, whose duty it was to make such an estimate when required. No viewers had, however, then been appointed to definitely assess benefits and damages. The referee and the court below followed the ruling in Keller v. Scranton, 200 Pa. 130, which holds that unliquidated damages to land owners from a public improvement are a debt within the meaning of the Constitution, and they very properly concluded that the estimate of the director was a sufficient basis upon which to determine the amount of the indebtedness to be incurred by the city in connection with the improvement. At the same time they held that the estimate as to benefits, which might be assessed against property holders was altogether too uncertain and speculative, to be accepted as a proper item of deduction under the Act of April 20, 1874, P. L. 65, as an "outstanding solvent debt." The director of public works has excellent facilities for estimating the cost of the work, and his estimate may well be taken as a legitimate basis upon which the city may incur obligations. But when it comes to the assessment of benefits another method is provided by law. Such an assessment is to be made by a board of viewers, and until that board has acted the amount of the benefit must remain an uncertain quantity. And for that reason the benefits could not properly be considered as an offset, at that stage of the proceedings. The referee did hold that certain special assessments against properties benefited could be deducted as outstanding solvent debts, owing to the city, when their amount had been definitely fixed by an award of viewers, from which no appeal had been taken, or if taken, had been determined. But in other cases where the proceedings were incomplete, as where reports were not yet filed, or had not been finally confirmed, or where appeals were pending, he rightfully refused to classify the assessments as solvent debts due

to the city. He was justified in making this distinction by the decisions of this court in Elliott v. Philadelphia, 229 Pa. 215, and McGuire v. Philadelphia (No. 1), 245 Pa. 287. Until the assessments were complete and their amount definitely fixed, they could not be regarded as debts absolutely due and payable to the city, and it was such only which were to be considered as offsets.

It is also contended that certain judgments, which had been obtained against the city, for damages for personal injuries, which by the referee were included in computing the debt of the city, should not have been so included, because it is suggested, such obligations are usually paid out of current revenue. We think it is a sufficient answer to this, to say that such judgments can hardly be fairly regarded as being within the class of ordinary expenses. And in addition to that it may be said that it was not shown that a sufficient appropriation had been made from the current revenue to cover such liabilities during the fiscal year.

The assignments of error in the appeal upon the part of the city at No. 133, October Term, 1915, are overruled, with the exception of the twelfth, which is to the final decree. As to that, the questions raised will be considered in connection with the appeal of the plaintiff.

In his fourth finding of fact, the referee found that by Ordinance No. 389, the City of Pittsburgh authorized and directed the issuance and sale of bonds of said city in the aggregate principal amount of $2,760,000 for the purpose of "funding the existing unfunded indebtedness of the city, consisting of contractors' claims, judgments and assessments, arising from the opening, widening and improving of streets and the construction of sewers, and the acquirement of property for public use, and other floating indebtedness," said bonds being designated "Funding Bonds, 1914." Counsel for plaintiff points out that in the ordinance authorizing the issue of these bonds, no provision is made for the cancellation of the items of floating indebtedness simultaneously with the

issue of the new bonds, and he suggests that as a consequence there will be some period of time at least, during which the new bonds and the old indebtedness will be in existence at the same time, thus constituting during that period an increase of debt. The suggestion is extremely refined, and is without substantial merit. The proceeds of the new bonds must be inviolably held for application to the purpose for which the bonds were authorized to be issued. If for any reason there should be delay in the surrender of the old items of indebtedness, the proceeds of the new bonds would remain as cash in the hands of the city, applicable only to the reduction of such indebtedness. Beyond question, this would constitute a complete offset. As was stated with reference to other funding bonds, under consideration, in the former part of this opinion, such bonds, when issued to take the place of valid pre-existing indebtedness, neither create new debt, nor increase the old debt. They merely work a change in the form and terms of payment of the existing indebtedness.

The second point raised in the argument of counsel for plaintiff is, that a claim made by the Pittsburgh Board of Education against the city, should have been recognized and regarded as a debt. It appears, however, from the record that the claim of the board of education is disputed, and that all liability on that account is denied by the city. We can see no good reason for regarding unliquidated and disputed claims pending against a municipality, as part of its indebtedness, where all liability upon such claims is denied.

The next particular in which plaintiff questions the action of the court below, and of the referee, is as to their allowance of a deduction in computing indebtedness of the city, of the amount of certain assessments, secured by undisputed liens against properties specially benefited by the improvement of streets and the construction of sewers. We think these liens may fairly be regarded as solvent debts due and owing to the city, and

as such they are to be considered as a proper offset to the floating indebtedness incurred without the assent of the electors. The liens are presumably well secured, and the property against which they are filed is liable to the extent of the lien, and can be sold to enforce payment. It appears from the record, that past experience shows that at least ninety per cent. of these claims are collectable within one year's time, and it was upon that basis, that the estimate was made, and the offset was allowed. It further appears that the city has also a statutory remedy·in assumpsit against property owners for the collection of benefit assessments. So that without doing any violence to the term the amounts secured by these liens may fairly be regarded as solvent debts, owing to the city.

The next and perhaps the most important question raised by the appeal of plaintiff, is as to the method of ascertaining the net amount of councilmanic debt outstanding, or that which has been created without the consent of the electors. It appears from the record that in the sinking funds now maintained for the retirement of councilmanic bonds, there are held, as investments, both councilmanic and electoral bonds; and in the sinking funds for the retirement of electoral bonds, there are held, as investments, both electoral and councilmanic bonds. It is argued on behalf of plaintiff that only such councilmanic bonds as are held in the councilmanic sinking funds, are properly to be regarded as an offset against the gross amount of councilmanic indebtedness, and that neither bonds authorized by the electors, which are held in councilmanic sinking funds, nor cash held therein, should be deducted from such indebtedness. On the other hand, counsel for the city maintain that all the reserves in the councilmanic sinking funds, consisting of cash and the bonds of the city of whatever kind held therein, should be counted as offsets to the councilmanic indebtedness, without regard to whether those bonds be councilmanic or electoral in their origin. The referee

and the court below accepted the latter view and permitted the deduction from the gross amount of the councilmanic indebtedness of the city of the amount of cash, and the par value of both electoral and councilmanic bonds held in councilmanic sinking funds. In this we think they went too far, for the payment of electoral bonds does not reduce councilmanic debt. The principle involved was thoroughly discussed in Brooke v. Philadelphia, 162 Pa. 123. It was there pointed out that "what is called the sinking fund is the mere conduit, through and by which the money raised by annual taxation reaches its destination; it goes into the fund for a specific purpose, to which it is inviolably pledged: when there, the commissioners must see to it that it accomplishes its purpose, the payment of the funded debt of the city: when, with that end in view, they from time to time purchase any portion of the funded debt of the city, then the inviolable pledge of the fund, to the extent of the purchase, is kept: that much of the sinking fund has been, in fact, applied in payment of the funded debt." It was also pointed out, that securities in the fund, other than obligations of the city, while they did constitute assets, and represented savings of the city, did not operate in reduction of the funded debt, and could not be counted as an offset. Applying that principle to the present case, in estimating actual councilmanic debt, we may not include bonds in the sinking fund which are not part of the indebtedness which is to be redeemed. The purchase of such bonds works no actual reduction of councilmanic indebtedness. But the purchase of councilmanic bonds by the city no matter whether for councilmanic or electoral sinking funds does work to the discharge of the obligation to the amount of the purchase. Normally each sinking fund should be invested in the bonds it is created to extinguish. But as the referee has found, each sinking fund holds bonds of both classes. This condition will require at the maturity of an issue, an exchange of bonds, by the com-

missioners, or a substitution of cash, for the bonds not of that particular issue. This matter can readily be adjusted by the managers of the sinking funds, for they are obliged to provide at the maturity of each issue a sum which will retire that issue, which sum may be made up in cash, or in the bonds of that issue which have been purchased and held in the sinking fund. When it comes to the source of payment, there is no distinction between councilmanic and electoral bonds. Both must be paid by the taxpayers. When the city purchases and places in its sinking funds, some of its own bonds, the act in so far as the public is concerned, is a discharge of its obligation, to the amount of the purchase. It would follow, therefore, that the proper rule in preparing a statement showing borrowing capacity of the city authorities, without a vote of the people, under the two per cent. limit, is to take the gross councilmanic debt, and from it deduct the amount of all councilmanic bonds held in all sinking funds of the city. Deduct also the cash on hand which has been paid into the sinking fund for the specific purpose of retiring the particular issue in question, and which cannot lawfully be diverted to any other purpose. In the present case, an inspection of the summary of the sinking fund reserves shown in plaintiff's Exhibit No. 5, makes it plain that by an exchange of the $552,400 of councilmanic bonds held in the electoral sinking fund, for an equal amount of electoral bonds now held in the councilmanic sinking fund, all of the councilmanic reserve bonds could be placed. in the councilmanic sinking fund.

By agreement of counsel this case was considered and decided with respect to the financial stituation of the city as it stood on September 30, 1914. It would not, therefore, be affected by the Acts of Assembly of May 6, 1915, which have been brought to our attention. The effect of these acts would seem to be to make a city to which contiguous municipalities have been annexed, liable for the payment of not only its own debt but also of the debt of

the annexed municipalities, and to require a uniform tax to be levied upon all the territory included in the consolidated city. It is suggested that the result is to make all the indebtedness of the several municipalities, though incurred with the assent of the electors, an indebtedness of the consolidated city incurred without the assent of the electors of that city. In other words, the entire indebtedness is transferred to the two per cent. class, so far as the consolidated city is concerned. The questions involved in this new legislation are complicated and important, and deserve full argument and careful consideration, freed from other complicated questions. But as it is unnecessary in so far as this case is concerned, to consider these acts of assembly we express no opinion as to their scope or effect at this time.

In plaintiff's appeal, at No. 134, October Term, 1915, the first, second, third, fourth, eighth and ninth assignments of error are dismissed. The fifth assignment is sustained. The questions raised by the other assignments will depend for answer upon the result of the calculation to be made in accordance with the method of ascertaining the net councilmanic debt, which we have indicated. It is, therefore, ordered that the record be returned to the court below for further proceedings in accordance with this opinion. The costs of this appeal, and in the court below, to be paid by the City of Pittsburgh.