# Chew et al., Appellants, *v.* City of Philadelphia et al.

*Equity—Municipalities—Railroads—Contracts—Illegality—Borrowing capacity—Eminent domain—Freight yard purposes—Ordinances — Appropriation — Injunction — Taxpayers' and property owners' bill—Multiplicity—Laches—Acts of April 8, 1846, P. L. 272; March 17, 1869, P. L. 12; June 9, 1874, P. L. 282, and June 11, 1879, P. L. 130.*

1. The rule of laches applies to a taxpayers' or property owners' bill to enjoin a municipality from carrying out a contract involving a public improvement about to be constructed without legal authority.

2. A city will not be enjoined from carrying out a contract for municipal improvements on the ground of insufficient borrowing capacity, where the bill in equity was not filed until all the money had been either actually or in effect raised by the city and a large part thereof actually expended on the improvement.

3. The chancery powers of the courts in the County of Philadelphia to issue injunctions against the erection or use of any public works is materially modified by the Act of April 8, 1846, P. L. 272, which prohibits the exercise of such power until the questions of title and damages shall be submitted and finally decided by a common law court.

4. Where a municipality and a railroad, acting under the authority of the Acts of June 9, 1874, P. L. 282, and March 17, 1869, P. L. 12, contract in relation to the appropriation of land for yard or other facilities required to meet present and future needs created by a general scheme for railroad relocation, the elevation of tracks and other improvements of great magnitude, a court will not inter-

fere with the exercise of the combined judgment of the contracting parties as to the necessity and extent of such taking in the absence of strong and conclusive evidence to the effect that the taking was arbitrary and not for legitimate railroad purposes.

5. A bill in equity filed by taxpayers and property owners of the City of Philadelphia averred that in pursuance of a city ordinance the city and the defendant railroad companies entered into a contract for railroad relocation and improvement under which the city increased the municipal debt beyond the then legal borrowing capacity; that no sufficient prior appropriation was made to meet the obligations thereby incurred, as required by the Act of June 11, 1879, P. L. 130; and that the lands intended to be taken were greatly in excess of the needs of the railroad companies for the present and many future years. Complainants prayed that the ordinance and contract bo declared void, that the city and the railroad be enjoined from spending any money or otherwise proceeding thereunder, and that the railroads be restrained from taking any lands under condemnation proceedings in pursuance of said ordinance and contract. It appeared that the purpose of the development was the abolition of railroad grade crossings, the location of well situated sites for municipal piers and docks and the unifying and improving of one railroad system in conjunction with others in the city. It appeared that the injunction was not applied for until the expiration of two years and three months from the date of the ordinance, and until after more than $2,000,000 had been actually raised and appropriated and a large part of it spent by the city, and a loan for the balance of the estimated cost, amounting to nearly $9,000,000, had been authorized by councils and approved by the people at a special election. The project had been given widest publicity, but no previous attack had been made on it in the courts. There was no competent evidence that the amount of land to be taken was in excess of probable future freight yard requirements of the defendant companies. The lower court dismissed the bill. *Held,* no error.

6. Not decided whether a taxpayers' and property owners' bill is bad for multiplicity.

Argued March 20, 1917. Appeal, No. 385, Jan. T., 1916, by plaintiffs, from decree of C. P. No. 2, Philadelphia Co., March T., 1916, No. 4648, dismissing bill in equity for injunction in case of Mary J. B. Chew, Martha M. Brown, Edward Hoopes, Joseph A. Janney, Jr., Joseph A. Steinmetz, Charles C. Harrison, Andrew J.

Toland, Delaware River Real Estate Company, a Corporation, Greenwich Terminal Company, a Corporation, v. City of Philadelphia, Thomas B. Smith, Mayor of said City; George S. Webster, Director of the Department of Wharves, Docks and Ferries of said City; George E. Datesman, Director of Public Works of said City; John M. Walton, Controller of said City; Philadelphia, Baltimore & Washington Railroad Company; Pennsylvania Railroad Company; Baltimore & Ohio Railroad Company; Philadelphia Belt Line Railroad Company, and Schuylkill River East Side Railroad Company. Before BROWN, C. J., STEWART, MOSCHZISKER, FRAZER and WALLING, JJ. Affirmed.

Bill in equity for an injunction. Before WESSEL, J.
The facts appear by the opinion of the Supreme Court.
The lower court dismissed the bill. Plaintiffs appealed.

*Error assigned,* among others, was in dismissing the bill.

*Francis B. Bracken,* with him *Samuel B. Scott,* for appellants.—The contract imposed upon the city an obligation to the extent of the expenditure to be made thereunder by the city: Brown v. Corry, 175 Pa. 528; Lesser v. Warren Borough, 237 Pa. 501; McKinnon v. Mertz, 225 Pa. 85.

  The contract is invalid because not preceded by an appropriation to cover the estimated cost of the work undertaken by the city: Act of June 11, 1879, P. L. 130, Sec. 3; Act of June 1, 1885, P. L. 37, Article XIV, Sec. 1; Bullitt et al. v. Philadelphia et al., 19 Pa. D. R. 1091; Hinkle v. Philadelphia, 214 Pa. 126; Smith v. Philadelphia et al., 17 Pa. D. R. 231, 18 Pa. D. R. 769.

The refusal of the court to admit testimony offered by complainants to show that the proposed condemnation of

lands by the railroads was arbitrary, was reversible error: Pittsburgh Junction Railroad Company's App., 122 Pa. 511; Pittsburgh, Ft. Wayne & Chicago Ry. Co. v. Peet, 152 Pa. 488; Bigler v. Penna. Canal Co., 177 Pa. 28; Snyder v. Balto. & Ohio R. R. Co., 210 Pa. 500; Scranton Gas & Water Co. v. Del., Lack. & Western R. R. Co., 225 Pa. 152; Wilson v. Pittsburgh & Lake Erie R. R. Co., 222 Pa. 541; Robinson v. Penna. R. R. Co., 161 Pa. 561.

*John P. Connelly,* City Solicitor, with him *Joseph G. Magee* and *Ernest Lowengrund,* Assistant City Solicitors, and *Gill & Linn, Graham & Gilfillan, Francis I. Gowen* and *John G. Johnson,* for appellees.—The contract confers an option or series of options on the city and does not impose upon it a binding obligation. It is a program of improvements and not a contract or obligation: Burlington Water Co. v. Woodward, 49 Iowa 58; Stedman v. Berlin, 97 Wis. 505 (73 N. W. Repr. 57); Doland v. Clark, 143 Cal. 176 (76 Pac. Repr. 958); Hay v. City of Springfield & Capital Electric Co., 64 Ill. App. 671.

The contract is not such a contract as is contemplated by the Act of June 11, 1879, P. L. 130. Municipal authorities are the proper parties to decide upon the scope of municipal improvements: Interstate Vitrified Brick & Paving Co. v. Philadelphia, Mack Paving Co. et al., 164 Pa. 477; Chandler v. Gardner et al., 2 Pa. C. C. 407; Brown v. Philadelphia et al., 17 Philadelphia 298; Wheeler et al. v. Rice et al., 83 Pa. 232; Baily et al. v. Philadelphia et al., 6 Pa. D. R. 727.

Under the Act of April 8, 1846, P. L. 272, the court had no jurisdiction to grant an injunction: Wolbert v. City of Philadelphia, 48 Pa. 439; Wheeler et al. v. Rice et al., 83 Pa. 232; Murtagh v. City of Philadelphia & Keystone Bridge Co., 1 W. N. C. 37; Flanagan v. City of Philadelphia, 8 Philadelphia 110; Philadelphia &

Reading R. R. Co. v. City of Philadelphia et al., 8 Philadelphia 284.

The complainants are barred by laches: Becker v. Lebanon & Myerstown St. Ry. Co., 188 Pa. 484; Maust v. Penna. & Md. St. Ry. Co., 219 Pa. 568; Good v. Queens Run Fire Brick Co., 224 Pa. 496; Chambersburg Shoe Mfg. Co. v. Cumberland Valley R. R. Co., 240 Pa. 519.

OPINION BY MR. JUSTICE MOSCHZISKER, April 30, 1917:

The bill in this case was filed by seven individuals and one corporation, as property owners and taxpayers, for themselves and such others as might become parties thereto.   Before hearing, the Greenwich Terminal Company, a corporation, having acquired the real estate of all the original complainants, asked and received permission to intervene as an additional plaintiff, "for the protection of its interests in the premises," being certain tracts of land, in the southern section of the City of Philadelphia, condemned for freight yard purposes, as hereinafter more particularly set forth.   The other parties remained upon the record, however, as taxpayers, the last named corporation not having asked to intervene in that capacity.   Suit was commenced May 22, 1916; plaintiffs did not press for a preliminary injunction, and the case came to trial September 26, 1916; on November 6, 1916, the chancellor filed his findings of fact and conclusions of law, with a decree nisi; December 14, 1916, exceptions thereto were disposed of and the bill dismissed upon, inter alia, the ground of laches; plaintiffs have appealed.

To indicate the material contentions insisted upon by the appellants, it is necessary to note only the following averments and prayers of their bill: Briefly stated, the plaintiffs allege that, in pursuance of an ordinance of the city councils, dated February 14, 1914, a contract authorized therein was executed on March 23, 1914, between the City of Philadelphia and the several railroad

companies named with it as codefendants; that this contract is illegal and void, first, because the city is therein obligated to expend approximately ten million dollars which, at the date of the ordinance, constituted an increase in the municipal debt beyond the then legal borrowing capacity; and, next, because no sufficient prior appropriation was made to meet the obligations thereby incurred; finally, that the lands which the railroads intend to take for freight yards, in carrying out the plans contemplated by the ordinance, are greatly in excess of their needs "both at present and for many years to come," such lands embracing properties of the complainants, which the latter desire to retain for industrial uses. They pray, (1) that the ordinance and contract be declared void; (2) that the city and the railroads be enjoined from spending any money or otherwise proceeding thereunder; (3) that the railroads be especially restrained from "taking any lands under condemnation proceedings, in pursuance of said illegal ordinance or contract."

On this appeal, the plaintiffs state the following questions involved: (1) Did the contract and ordinance under consideration impose such a liability upon the city as to increase its debt within the meaning of the constitution? (2) "Was an appropriation by councils, to cover the liability of the city under the contract, essential to its validity?" (3) "When a railroad company proposes to condemn land under its power of eminent domain, is the owner precluded from having a judicial inquiry whether or not the taking is arbitrary, or for legitimate railroad purposes?" (4) Should the plaintiffs' bill have been "dismissed on the ground of laches?"

As said by the learned court below, "the project for the improvement of the southern section of Philadelphia involved in this litigation, is the most considerable single development in the city's history"; and its purposes are well set forth in the following excerpt from a paragraph

of the city's answer, which was in no wise impeached at trial: "The abolition of railroad crossings at grade in that section has engaged the attention of the municipal authorities and the public for many years.......Wide publicity was given to the plans, and, through the newspaper press and otherwise, the attention of the entire community was invited thereto. The method thought best adapted to the advancement and upbuilding of that locality, as finally evolved, was embodied in this ordinance......; it has in view three principal objects: First, the abolition of the grade crossings which have held back the growth of the lower portion of the city ever since they have existed,......to be accomplished by elevating most of the railroad trackage traversing that section, and incorporating into one system......, south of the traveled territory, all the remaining tracks —so eliminating existing grade crossings to the number of fifty-three, together with seventy-three other grade crossings which would result from the opening of streets under the plan, being a total of one hundred and twenty-six such surface crossings, or substantially all of them ......; Second, location of well situated sites for great municipal piers and docks, to be built at such points as to enable their use to enhance the city's commercial and port resources,......to be effected by taking over from the Pennsylvania Railroad Company and its associates a part of their properties......, and from the Baltimore and Ohio Railroad Company and its associates their pier [locating it]......., placing the piers of the railroad companies at the southeastern extremity of the city, and providing adequate storage, yardage and shifting area in lieu of that taken by the city......; Third, the unifying and improving of the belt line railroad in the southwestern and southern part of the city, and its operation in conjunction with the tracks of the various railroad companies in that locality......together with provision for the joint use upon equitable terms not only

of the belt line tracks, but also of those of the other railroads, by any additional railroads which may in the future seek entrance into the city." These plans, as incorporated in the ordinance and contract now before us, were duly submitted to the Pennsylvania State Utilities Commission and approved by that body, before the present proceedings were commenced.

As to the first question involved, the injunction was not applied for until the expiration of two years and three months from the date of the ordinance; at that time two million dollars had been actually raised and appropriated, and a large part of it spent by the city; and a loan for the balance of the estimated cost to the municipality of all the improvements outlined in the ordinance, amounting to $8,940,120, had been authorized by councils and approved by the people at a special election. Thus it may be seen that the funds required by the city had been either actually appropriated or specially dedicated to the purposes of the contract and ordinance before the municipality's right to borrow the money was questioned in this action; moreover, the legality of these loans has never been attacked either directly or indirectly in any other proceeding. That is to say, while the plaintiffs dallied, the city proceeded to raise the necessary funds, and a substantial part of the money had actually been spent, in accordance with the terms of the ordinance, before the present proceeding was instituted.

The city controller gave testimony tending to show that at the date of the ordinance the municipality had a margin of legal credit, or borrowing capacity, beyond the estimated cost to it of the improvements in question; but the chancellor refused certain other testimony, offered by plaintiffs, to prove that the controller had not taken into account some items of charge which, if allowed to figure, would reduce this margin to such an extent as to preclude the floating of loans sufficient for the purposes of the present ordinance and contract. It is not neces-

sary, and we shall not go into the question of the propriety of the chancellor's finding to the effect that the municipal credit was more than adequate to cover the full amount of the estimate, or of the correctness of his ruling in refusing the testimony offered to supplement the evidence given by the controller; for, after delaying their complaint till all the money had been either actually or in effect raised by the city, the plaintiffs can not be heard to say that the contract and ordinance under consideration was invalid because of an alleged insufficient borrowing capacity. To permit such belated collateral attacks upon the validity of duly authorized municipal loans, would prove highly prejudicial to the public interests.

Under the circumstances at bar, the second question stated for our consideration by the appellants, as to the necessity of prior appropriations by councils sufficient to meet the full amount of the estimated cost of the contract to the city, is no more controlling of the present case than the one mentioned above. As already indicated, the agreement between the municipality and the railroads is very comprehensive in character, and thereunder, perhaps, the former may in the end be found to have assumed obligations to a total of $10,940,120, according to the estimate of the proper city authorities (Schuldice v. Pittsburgh, 251 Pa. 28, 33); only one million dollars of this amount being appropriated in the ordinance now under attack. The ordinance in question is carefully drawn to avoid legal pitfalls, particularly the prohibition of the third section of the Act of June 11, 1879, P. L. 130, relied upon by appellants, which calls for previous appropriations whenever municipal contracts requiring the expenditure of money are made. The plaintiffs contend that the present case falls within this act, while the defendants claim otherwise. The court below decided, however, that the agreement did not impose an immediate obligation upon the city to the extent of the

total estimated expenditures which the latter eventually might make thereunder; but that, according to its terms, the obligations of the municipality, beyond the million dollars presently appropriated, would arise only from time to time, as other appropriations were actually made to carry on the work and perfect the purchases referred to in the ordinance.

After outlining in great detail the work to be done, the properties to be acquired and the proportionate cost thereof to be borne by the city and railroads respectively, the ordinance provides that the entire improvement shall be completed within five years, but that, in event of delay by "the city in making sufficient appropriations," this time limit shall be extended; it also provides that the work "shall be divided into sections......, that one or more sections shall be executed at a time, as and when appropriations therefor shall be made by the city"; that the railroads "shall not be required to undertake and contribute to the cost of any section of the work unless the city shall have first appropriated a sum sufficient to meet its share of the estimated cost of such section"; finally, that "the acquisition of property and the work of construction......authorized in this ordinance shall be carried on, from time to time, as councils shall provide the necessary funds, and the railroad companies shall provide their proportion of the cost whenever they shall be notified to do so by ordinance of councils......, Provided, that every contract for public improvements authorized by this ordinance shall contain a clause that it is subject to the provisions of the Act of June 1, 1885, P. L. 37, and the liability of the city thereunder shall be limited by the amounts which shall have been or may be from time to time appropriated for the same."

Much may be said both for and against the view of the court below, that this ordinance represents a mere program of improvements laid out and agreed to between the municipality and the railroads, to be executed in con-

venient blocks, or sections, when and as appropriations may at its option be made by the former to cover the city's proportion of the cost of the particular section about to be undertaken, and that obligations in the nature of indebtedness would arise thereunder only from time to time, when and as the city thus committed itself to a particular section of the improvement by making an appropriation to cover its proportion of the cost thereof; but, owing to the laches of the complainants, we do not feel called upon to determine this point. Here, the plaintiffs waited for more than two years before filing their bill, and, in the meantime, vast sums of money had been raised and spent under the ordinance; so that, to stop the undertaking at this time would work a great public evil. It may be noted that the present appeal was not made a supersedeas, and hence the improvement has now been in course of completion for about three years.

The original plaintiffs sued as taxpayers, as well as property owners; but, as previously stated, they subsequently disposed of their property holdings to the intervening plaintiff, and now appear simply as taxpayers. Counsel for the appellants well says, "The bill might, perhaps, have been objected to on the ground of multifariousness," since it endeavors to have determined at one and the same time the separate rights of taxpayers and property owners; while we shall not stop to discuss the matter, yet, in passing, we note it is apparent that the bill was filed to protect the particular individual property rights of the plaintiffs, rather than their general rights as taxpayers. The rule of laches applies, however, from whichever point the proceedings may be viewed—whether as a taxpayers' or property owners' bill; and, when the facts call for its application, the rule may control even in a case where there is involved a public improvement constructed without lawful authority (which we do not hold to be the fact in the present case) : Becker v. Lebanon & Myerstown St. Ry. Co.,

188 Pa. 484, 493-6; Keeling v. Pittsburgh, Va. & Charleston Ry. Co., 205 Pa. 31, 34; Condron v. Penna. R. R. Co., 233 Pa. 197. Moreover, the power to issue injunctions in cases such as the one before us is much restricted by the Act of April 8, 1846, P. L. 272, entitled, an act "relating to the chancery powers of courts in the City and County of Philadelphia," which provides "that no courts within the City and County of Philadelphia, shall exercise the powers of a court of chancery, in granting or continuing injunctions against the erection or use of any public works of any kind, erected or in progress of erection, under the authority of an act of the legislature, until the questions of title and damages shall be submitted, and finally decided by a common law court." This act was discussed, sustained and applied in Wolbert v. Philadelphia, 48 Pa. 439 (property owner's bill); Wheeler v. Philadelphia, 77 Pa. 338, 344, and Wheeler v. Rice, 83 Pa. 232, 4 Brewster's Rep. 129 (taxpayers' bills); also see opinion by SHARSWOOD, J., in Flanagan v. Philadelphia, 8 Philadelphia 110, 111, and by PAXSON, J., in Philadelphia & Reading R. R. Co. v. Philadelphia, id. 284.

We have already sufficiently disposed of the last of the four questions stated by the appellants for our consideration, and the only one remaining is the third, which involves the right of the defendant railroads to condemn certain lands for freight yard purposes. The agreement incorporated in the ordinance provides that two of the railroads are to surrender and the city is to purchase the former's present yards, when the latter makes appropriations sufficient for that purpose, these properties to be used for and in connection with new and much needed public docks and piers, to be constructed and maintained by the city; it also provides that lands for yard facilities equal to those abandoned by these railroads shall be taken up by them in a designated section on the line of the improvement, the cost thereof to be borne equally by

the city and the corporations in question, but any additional real estate needed for yard purposes to be paid for solely by the latter. The map prepared by the city, and introduced in evidence by plaintiffs, shows two large tracts of land, one marked "Space required for Pennsylvania Railroad Terminal Yard," and the other, immediately south thereof, designated "Space required for Baltimore and Ohio Railroad Terminal Yard"; these are the tracts owned by the plaintiffs. It is plain from this last mentioned piece of evidence, and other proofs in the case, that the railroads and the city agreed between themselves that the condemnation of this land for railroad yards was a necessary and essential part of the general improvement contemplated by the ordinance.

While, in their statement of the third "question involved," the appellants set forth a broad, general subject for our consideration, yet, when the record covering this branch of the case is looked at critically, as it must be in a matter of such grave public importance, it will be seen that the real points thereby presented are: (1) Under the circumstances at bar, do the railroads possess a legal right to condemn any of the lands here in controversy? (2) If so, then can they lawfully take therefrom an acreage greater than required for their present needs? The prayer of the bill is "that said defendant railroads, and each of them, be restrained......from taking any lands under condemnation proceedings, in pursuance of said illegal ordinance or contract." When the case came to trial, however, the plaintiffs seem to have assumed the position that the corporations which were required to surrender their present freight yards, might lawfully condemn other lands to take the place of those given up, but only such as are necessary for their "actual needs"; further, that it was the province and duty of the chancellor to determine whether the railroads were about to "take and condemn [for freight yard purposes] any of the plaintiffs' said lands arbitrarily

and without regard to their [the railroads'] actual needs." The court below held that, the city and railroad authorities having acted in the matter, it would not overrule their judgment.

At trial, there was no real effort to go into the question of the future freight yard requirements of any of the defendant companies. A witness was placed upon the stand by plaintiffs, and the following tender of evidence was made: "If it please the court, the......railroad company, as is conceded in this proceeding, proposes to condemn for railroad purposes some two hundred and odd acres of land indicated on this map [being the map previously referred to in this opinion]. I offer to prove by this witness the extent of its [the railroad's] business now being carried on......, as a step in the proof that the taking of this approximate mile of river front in lieu of the front to be abandoned......, is an arbitrary taking, and in no wise necessary for railroad purposes in connection with the present plan of abolishing grades in South Philadelphia or otherwise." The overruling of this offer forms the basis of the principal assignment of error in support of the "question involved" now under consideration.

It will be noticed that the offer just quoted was to show the business "now being carried on," and, although this was stated to be "a step in the proof," yet there was no other proposal, either then or afterwards, to show that the lands about to be appropriated were not essential to meet the future requirements of the railroads. It is well established that, in cases of this character, "a liberal consideration for future as well as existing necessities," is the test: Pittsburgh Junction R. R. Company's App., 122 Pa. 511, 530; Pittsburgh, Ft. Wayne & Chicago Ry. Co. v. Peet, 152 Pa. 488, 494. Moreover, this contract was expressly entered into under and by virtue of authority granted by the Act of June 9, 1874, P. L. 282, which provides that the proper municipal au-

thorities are empowered to make contracts with railroad companies whose lines run within the limits of their cities, "whereby the said companies may relocate, change or elevate their railroads within said limits......in such manner as in the judgment of such authorities...... may be best adapted to secure the safety of lives and property and promote the interests of said city," and "for that purpose the city authorities shall have power to do all such acts as may be necessary and proper to effectually carry out such contracts." This act has been liberally construed whenever before the courts (Western Penna. R. R. Co.'s App., 99 Pa. 155, 162-3; Bryner v. Youghiogheny Bridge Co., 190 Pa. 617, 627; also see the opinion of that eminent jurist, the late Judge HARE, in Duncan v. Penna. R. R. Co., 7 W. N. C. 551, 554), and, in conjunction with the Act of March 17, 1869, P. L. 12, conferring the right of eminent domain upon railroads "to straighten, widen, deepen, enlarge and otherwise improve" their lines (Wilson v. Pittsburgh & Lake Erie R. R. Co., 222 Pa. 541, 544-5), the legislation in question not only affords support to the contract here in controversy, but confers such broad powers upon municipal and railroad authorities that it would take strong and conclusive evidence to justify a court's interference, to any degree, with their combined judgment, exercised thereunder, when dealing with the matter of yard or other facilities required to meet present and future needs created by a general scheme for railroad relocation, elevation and improvement, of the magnitude of the one at bar; the record under review shows no evidence, either produced, offered or suggested, to warrant such interference in this case.

When the subject in hand was under discussion at trial, the learned chancellor well remarked that, so far as the City of Philadelphia and the railroads are concerned, "This is an improvement for the next century, or two centuries to come"; and, since the appellants assert

their lands to be the only ones in the locality in question available and suitable for freight yard purposes, if this assertion be true, and the general scheme of relocation is to prove a permanent success, it may readily be seen how necessary it was for the city and railroads to look far into the future, in planning for and providing yard facilities.

Plaintiffs, of course, have a full and ample remedy at law to recover damages suffered by them as property owners; but, on the assignments now before us, we are not convinced either of reversible trial error or that the court below would have been warranted in granting any part of the relief prayed for in the bill.

The decree is affirmed at the cost of appellants.