Crown Products Company, Appellant, *v.* Pennsylvania Public Utility Commission et al.

346

Argued May 4, 1943. Before KELLER, P. J., BALD-RIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*John M. Smith, Jr.,* with him *Thomas C. Egan,* for appellant.

*G. Coe Farrier,* Assistant City Solicitor, with him *Robert McCay Green,* City Solicitor, for City of Philadelphia, intervener.

*Allen Lesley,* with him *Paul D. Larimer, Harry M. Showalter,* and *James H. Duff,* Attorney General, for Pa. Public Utility Commission.

PER CURIAM, May 6, 1943:

The appeal is dismissed and the order of the Public Utility Commission is affirmed.

An opinion will be prepared and filed later.

OPINION BY KELLER, P. J., June 1, 1943:

On May 4, 1943 this appeal was argued at length. We had a short while before (April 12, 1943) heard argument on a motion to make the appeal a supersedeas, which we granted, but advanced the date for argument. Because of the importance of the case and the necessity for a prompt decision, we gave it immediate consideration, and on May 6, 1943, entered a formal judgment dismissing the appeal and affirming the order of the Public Utility Commission, stating that an opinion would be prepared and filed later. This opinion is filed pursuant to that statement.

The appeal was from an order of the Commission entered February 24, 1943 refusing to modify its order,

dated July 1, 1942, granting a certificate of public convenience authorizing The Baltimore and Ohio Railroad Company to abandon its service and facilities on the portion of its branch line (The Schuylkill River East Side Railroad Company) which begins at a point in the bed of Wolf Street just west of Vare Avenue and its intersection with 28th Street, and extends eastward in the bed of Wolf Street five full blocks to 23d Street, thence south in the bed of 23d Street four full blocks to Oregon Avenue, thence eastward in the bed of Oregon Avenue five full blocks to its terminus at 18th Street, a distance of 1.28 miles; subject to the conditions therein specified, which included, inter alia, the removal of its tracks, rails and ties from the beds of Wolf Street, 23d Street, and Oregon Avenue, and at the crossings of public streets, and the leveling of the street surfaces for safe passage, in accordance with the provisions of an agreement between the City of Philadelphia, The Baltimore and Ohio Railroad Company, (hereinafter called 'The B & O'), and its wholly owned subsidiary, The Schuylkill River East Side Railroad Company, (hereinafter called 'The Schuylkill'), executed March 30, 1942 and filed with the Commission on May 25, 1942; and, also, providing for the abolition of nine grade crossings located at points where the tracks of The Schuylkill cross 24th Street, Passyunk Avenue, Ritner Street, Porter Street, Shunk Street, 21st Street, 20th Street, 19th Street and 18th Street, as prayed for in an amendment to said application made June 24, 1942; and it was also ordered (par. 12) inter alia:

"That the City of Philadelphia pay all compensation for damages, if any, due to the owners, exclusive of The Baltimore and Ohio Railroad Company and The Schuylkill River East Side Railroad Company, for property taken, injured or destroyed by reason of the abolition of the existing crossings at grade, in accordance with this order."

The appellant—the petitioner for a modification of said order,—is the tenant and occupant of a building located at the southeast corner of 23d and Ritner Streets, fronting on Ritner Street (the first street south of Wolf Street) 156 feet, and extending along 23d Street 390 feet, which it normally used as a plant for manufacturing felt products, but in which it now carries on the manufacture of insulating materials, packing materials and safety belts under certain war contracts. It leases the building from The Philadelphia Board of City Trusts, acting for the Girard Estate; but the record is silent as to when it became the lessee of the building or the length of its term. It is the only industry now served by this branch railroad. Photographs offered in evidence show two railroad tracks on 23d Street (which while laid out on the city map, has not been opened to public travel at this point), one of which is used to unload cars bringing in raw materials at the appellant's loading platform along 23d Street, and to ship some of its product. In its petition filed July 14, 1942 for a modification of the Commission's order of July 1, 1942, appellant prayed that the said order be modified by striking from Paragraph 3— which ordered the abolition of said nine grade crossings—so much thereof as called for the abolition of the grade crossings between the west side of Vare Avenue, near the intersection of Wolf Street, and 28th Street, and Oregon Avenue.[1] The petition did not specifically ask for any modification of paragraphs 1 and 2 of said order, which provided for the abandonment of service

---

[1] Paragraph 3 of the Commission's order was as follows, the part which the appellant asked to have stricken out being in brackets:

"Now, to-wit, July 1, 1942, it is ordered: ......

"3. That the crossings at grade at points in the City of Philadelphia, Philadelphia County, [where the tracks of the Schuylkill River East Side Railroad Company extending eastwardly along Wolf Street from the west side of Vare Avenue to

and the removal of tracks, rails and ties from the beds of the streets affected.

Application for the certificate of public convenience granted in this case was made by joint petition of the City of Philadelphia, The B & O, and The Schuylkill in furtherance of a plan or program for the abolition of railroad crossings at grade in South Philadelphia, as provided in certain agreements between said petitioners and The Pennsylvania Railroad Company, (hereinafter called The Pennsylvania), all of which had been presented to and approved by the Public Service Commission; and also in order to expedite the improvement by the City of certain streets, included in the general plan above mentioned, necessitated by the improved and enlarged facilities of the United States Government in that section of the city, including the United States Army Quartermaster's Depot, and to meet conditions created by the War Department.

The petition referred to the original plan or program for the abolition of railroad crossings at grade in South Philadelphia, which was contained in an agreement dated March 23, 1914, known as the 'South Philadelphia Agreement', which had been duly approved by the Commission. It was executed by the City and by all the railroads having tracks in the southern part of Philadelphia and provided that all the railroad tracks traversing the area included therein would eventually be eliminated or relocated for the improvement and development of that part of the City. The magnitude and importance of this plan may be seen by anyone

---

Twenty-third Street, thence southwardly along Twenty-third Street from its intersection with Wolf Street to Oregon Avenue], and thence along Oregon Avenue from its intersection with Twenty-third Street, to its terminus at or near Eighteenth Street, cross Twenty-fourth Street, Passyunk Avenue, Ritner Street, Porter Street, Shunk Street, Twenty-first Street, Twentieth Street, Nineteenth Street and Eighteenth Street are hereby abolished."

interested by a reference to the opinion of the Supreme Court in *Chew et al. v. Phila. et al.,* 257 Pa. 589, 101 A. 915, which affirmed a decree dismissing a bill in equity to have said contract of March 23, 1914 declared illegal and void.

The petition mentioned supplemental agreements to the plan which were entered into on January 23, 1920 and April 16, 1923, and were likewise approved by the Commission, and stated that in furtherance of the 'South Philadelphia Agreement' for the improvement of streets and highways, a plan embracing the abandonment of the service and facilities first above referred to had been worked out by the city and all the railroads concerned. Under it the B & O and the Schuylkill agreed to remove the tracks abovementioned and to release their right to reinstate the same, provided they were given an indeterminate lease covering their right to use a detour line over property of the Pennsylvania Railroad Company, the City and others between 25th Street and the Vandalia Yards of The B & O, until such time as the City should make available to the railroads a right of way extending along Swanson Street from Terminal Avenue to the Vandalia Yards.

The petition stated that City Council had passed an ordinance approving this plan and authorizing it to be put into effect, which was approved by the Acting Mayor on November 24, 1941; and that pursuant to said ordinance, the following agreements, *mutually dependent,* setting forth the plan and the duties and obligations of the City, The Schuylkill, The B & O, and The Pennsylvania, respectively, were executed on March 30, 1942 and filed with the Commission on May 25, 1942, at P. U. M. C. 974, pursuant to the requirements of the Public Utility Law:

(a) An agreement between the City of Philadelphia, The Schuylkill and The B & O, (as authorized by ordinance of said city approved November 24, 1941), pro-

viding for acquisition by the Railroad Companies of an indeterminate lease of right-of-way for detour track; assignment by the city to the Railroad Companies of said detour line tracks, ties, signals, etc., and for the ultimate removal of said detour track, and obligating the Railroad Companies to permit removal of their tracks from the beds of those portions of Wolf Street, Twenty-third Street and Oregon Avenue, as hereinbefore described;

(b) An agreement of lease between The Pennsylvania, The Schuylkill, and The B & O, and the City of Philadelphia, with respect to a part of the right-of-way of said detour line, and, an agreement of lease with respect to the remainder of said right-of-way between Greenwich Real Estate Company and The Schuylkill and The B & O;

(c) An agreement granting the railroad companies' consent and defining the conditions and manner under which said railroad tracks are to be removed from Wolf Street, Twenty-third Street and Oregon Avenue, in part performance of railroad obligations in agreement (a) above referred to.

The petition further pointed out that the improvements contemplated and for which approval was asked, not only would abolish railroad operation at grade in the beds of the streets involved but would also abolish eight existing crossings of intersecting streets at grade; and avoid an additional crossing at grade at Wolf Street and Vare Avenue when the latter shall have been improved and opened to public use, as it is in the City's immediate improvements plans to do; while the alternate route—known as The Detour Line—creates no new crossings at grade.

We have gone this fully into the details of these proposed mutually dependent agreements in order that the importance of the municipal interests at stake in their performance might be clearly apprehended.

The application set forth in paragraph 9 that the only patron presently served by said tracks proposed to be removed was the Crown Products Company, Twenty-third and Ritner Streets, which, petitioners were informed, occupied said premises under lease.

We refer to this because the Commission in its order filed July 1, 1942 made the following statement: "On March 13, 1941 Crown Products Company was notified of the contemplated abandonment of the branch line and on June 18, 1942 was notified of the hearing to be held on June 24, 1942.[2] No protest has been filed and no representative of Crown Products Company appeared at the hearing."

A careful reading of the printed record furnished us by appellant presents nothing that in our opinion refutes this statement. In its petition for a modification appellant did not aver that *it* had not received the notice as stated by the Commission. It averred only that it had instructed its counsel to set forth its views and to withdraw its objection only upon the entry of an order such as was sought in its petition for modification. It further stated, "Your petitioner believes that its situation was not adequately stressed in the record and prays that your Commission may do right and justice in the circumstances." At the hearing held on September 14, 1942, pursuant to appellant's petition for modification, which the Commission considered as a petition for rehearing, counsel for appellant stated

---

[2] A photostatic copy of letter, dated June 18, 1942 addressed to Crown Products Co., 23d & Ritner Streets, Philadelphia, notifying it of a hearing set for Wednesday, June 24, 1942 at 10:00 A. M. in the City Hall, Philadelphia, in re Application of the City of Philadelphia and the abovenamed railroad companies for approval of the removal of railroad tracks in the bed of Wolf Street, from the west side of Vare Avenue to 23d Street, and in the bed of 23d Street from Wolf Street to Oregon Avenue, etc., was submitted by the Commission pursuant to permission obtained at the argument.

that the first hearing that was held in the case was held the day after notice was given to *him*. If his client neglected to give *him* notice until the day before the date fixed for hearing, the Commission was not responsible; nor could the Commission be expected to notify *counsel* unless an appearance had been entered on behalf of appellant. Counsel also stated that on the day of the first hearing he was actually engaged in the trial of a case, but that he sent an associate up to the hearing. We have no doubt of the truth of this statement, but apparently his associate did not enter an appearance on behalf of appellant, or object for the appellant to the issuance of the certificate of public convenience applied for.

In any event, by the Commission's reopening and rehearing the case, appellant was not deprived of its right to be heard on the matters involved.

The Commission, in its order of July 1, 1942, reviewed the history of the 'South Philadelphia Agreement' and the subsequent agreements made to abolish the crossings at grade resulting from the construction in 1885-86 of The Schuylkill's branch railroad, 5.38 miles in length, to serve and develop the water front along Delaware Avenue. Originally constructed through an undeveloped section of the city, in the wake of the development, numerous grade crossings were created which resulted in many accidents. By ordinance, approved October 30, 1925, provision was made for the removal of the tracks and facilities located along Oregon Avenue between Delaware Avenue and Eighteenth Street, which action was approved by the Commission, and the present proceeding provides for the removal of the tracks and facilities and the abolition of the grade crossings between Eighteenth Street and the west side of Vare Avenue.

The Commission pointed out that the Federal Government had made available a sum of money in excess of

half a million dollars to the Department of Highways of this Commonwealth for the improvement of the city streets, including Vare Boulevard, located in the area surrounding the Quartermaster's Depot in the City of Philadelphia, which improvement requires the removal of the railroad tracks located in the beds of the streets here involved. The report and order recites the details of the proposed improvement; the need of the Quartermaster corps for certain equipment of the railroad company which will be released; the removal of all rails, ties, etc. from the beds of the streets, which will be leveled off and left in a smooth, passable condition; that the entire expense of repairing the track area on Oregon Avenue from Eighteenth Street to Vare Avenue, and the intersections of Vare Avenue with Wolf Street and of Twenty-third Street with Passyunk Avenue, will be borne by the Department of Highways of the Commonwealth; that the drainage facilities on Oregon Avenue and at the intersection of Vare Avenue and Wolf Street and Passyunk Avenue and Twenty-third Street will be provided by the Department of Highways of the Commonwealth at its sole cost and expense; that no public utility other than The B & O and The Schuylkill will be affected except temporarily, and that the City will provide and maintain any and all detours necessary.

Following the receipt of appellant's petition for modification of its order of July 1, 1942—which was in the nature of a petition for rehearing, and was filed within fifteen days of the entry of that order,—the Commission on August 11, 1942 fixed September 14, 1942 as the date for a hearing upon said petition and gave the City due notice of the hearing. On that date the City by its assistant city solicitor, entered its appearance *de bene esse* for the purpose of objecting to the jurisdiction of the Commission to reopen and rehear the case.

The attempt of the City to appear *de bene esse* as to

this hearing was a nullity. It was a party to the original proceeding. It had joined in the petition praying for the issuance of the certificate of public convenience, authorizing the removal of the tracks and the abolition of the grade crossings and the approval of the agreements referred to in it. Having appeared and obtained an order granting the prayer of its petition, it remained within the jurisdiction of the Commission until the proceedings were finally concluded: *Carey v. Carey,* 121 Pa. Superior Ct. 251, 257, 259, 183 A. 371. The order of July 1, 1942 would not become final and effective under the law until the time provided for applying for a rehearing (15 days—sec. 1006) or for an appeal (30 days—sec. 1101) had elapsed without a rehearing being applied for or an appeal taken. We said in *Penna. Railroad Co. et al. v. Public Service Comm.,* 118 Pa. Superior Ct. 380, 388, 179 A. 850: "The order of the commission of April 2, 1934 became final and effective when no appeal from it or the order dismissing the second petition for a rehearing was taken within the time limited by law." Until it became final and effective, it was subject to the allowance of a rehearing or to reversal on appeal, and the City could not limit the scope of its appearance or the jurisdiction of the Commission to take further proceedings in due course by any attempt to change its general appearance to one *de bene esse.* So, too, if before the order became final and effective, the City granted any rights based on the conclusiveness of the order, it ran the risk of the conveyance being set aside if the order was subsequently revoked or reversed.

The City's objection in this court to the jurisdiction of the Commission is in no better case.

The legislature has committed to the Public Utility Commission exclusive jurisdiction throughout the Commonwealth over the construction and the abolition of railroad crossings at grade (sections 409, 411) ; and of

the approval of contracts between municipal corporations and public utilities (sections 911, 920).

The Public Utility Law does not, in these respects, violate Article III, section 20, of the Constitution, which forbids The General Assembly delegating to any special commission, etc., any power to make, supervise or interfere with any municipal improvement, money, property or effects, or to levy taxes or perform any municipal function whatever. *Lansdowne Boro. v. Pub. Serv. Comm.*, 74 Pa. Superior Ct. 203, 215. The Public Utility Commission is not a *special* commission within the meaning of that section of the Constitution, and in considering and acting upon the *joint petition of the City and two railroad corporations* to approve certain contracts which they had made relative to the abandonment of public utility service and for the abolition of certain railroad crossings at grade, it was not usurping or attempting to usurp any municipal power or function, which is the thing forbidden by the Constitution.

There is no real similarity between this case and the cases relied on by the City on this point, to-wit, *Wilson v. Phila. School District*, 328 Pa. 225, 195 A. 90, and *Graham v. Phila.*, 334 Pa. 513, 6 A. 2d 78. In the *Wilson* case the Supreme Court held that an act of assembly which committed to an appointed school board, acting for a single school district, the power to *levy taxes* was unconstitutional as in violation of Art. III, sec. 20, of the Constitution; that the *legislative power to tax* could not be conferred on an appointive body. In the *Graham* case it was held that under the Act of March 11, 1789, 2 Sm. L. 462, section 11, which is still in force, the City of Philadelphia had the power to lease its gas works, (which it owned in its proprietary or business capacity and had owned long before the Constitution of 1873 was adopted), and assign the rentals derived from a lease thereof, without applying to and securing the approval of the Public Utility

Commission, since the proposed lease and contract of assignment were not within the provisions of the Public Utility Act of 1937, P. L. 1053, sections 911 and 920.

The contracts which the City and the railroad companies presented to the commission for approval were specifically within the provisions of the Public Utility Law, sections 409 and 411 and 911 and 920. See *City of Erie v. Pub. Serv. Comm.*, 74 Pa. Superior Ct. 265, 268, 270, 271; *Boro. of Carlisle v. Pub. Serv. Comm.*, 81 Pa. Superior Ct. 475, 478.

The Commission, having overruled the City's objection to its jurisdiction, proceeded to a hearing on the merits upon the petition of Crown Products Company for a modification of the order, and on February 24, 1943 entered its order denying the prayer of its petition and refusing to modify its prior order of July 1, 1942.

The Commission emphasized the following facts as important in reaching its conclusion:

"The Pennsylvania Department of Highways, the Philadelphia County Commissioners, and the City of Philadelphia have undertaken a vast street and highway improvement project covering the lower section of South Philadelphia west of Broad Street. An examination of the plan marked Exhibit 'I' [Applicants' Exhibit No. 1], will clearly indicate the extent of the area embracing this public project ...... Vare Avenue, a proposed highway authorized by the legislature, will extend in a northwestwardly direction from Twenty-fourth Street and Oregon Avenue to Thirty-fourth Street and Grays Ferry Avenue, intersecting Wolf Street at Twenty-eighth Street.

"Removal of the tracks will not only eliminate the dangers attending operation of freight trains through city streets, but will also eliminate eight street intersection crossings at grade ......

"Vitally interested in this public project is the United

States Government which has appropriated and made available to the Pennsylvania Department of Highways approximately one-half million dollars in order that streets which have been plotted may now be opened and paved, and, those having railroad tracks in the bed thereof be paved the entire width of the cartway after removal of the tracks, so that vehicular traffic be facilitated in and about the Government's expanded activities in this area. Disposition of its rails following removal has been provided for and will be governed by limitation Order L 88 of the War Production Board. Removal of the existing tracks is necessary to consummate the project because the State Highway Department under Legislative Act may not improve any highway in the bed of which public utility tracks are laid, or which does not belong exclusively as a highway to the municipality. In the immediate vicinity [are] the United States Marine Quartermasters Store Warehouses which extend along the south side of Oregon Avenue from Twentieth to Twenty-fifth Streets, and southward about three and one-half blocks to Packer Avenue. Oregon Avenue, because of the tracks in the bed thereof, is not paved to the entire width of the cartway, necessitating heavily ladened trucks to be pulled across the tracks over rough temporary crossings constructed with cinders ......

"In order to make the project possible, The Baltimore and Ohio Railroad Company has consented to relinquish its franchises forever and share one-half the cost of removing the rails. Contracts to this end have been executed pursuant to Commission approval ......

"Petitioner is the sole industry now served by this branch line. The siding serving Crown Products Company is parallel to the track of the branch line, *lies in the bed of Twenty-third Street* which is unimproved, and *does not enter lessee's property or connect with trackage entering lessee's property.*

"A witness for petitioner testified that on the average they received about three freight carloads of raw materials a day, and use about the same number of cars for shipping their finished products. Rail *shipments* are supplemented by motor truck. That removal of the branch line will cause petitioner some inconvenience cannot be denied, but The Baltimore and Ohio Railroad Company will provide team track facilities just west of the intersection of Vare Avenue and Wolf Street at Twenty-eighth Street, about four blocks away. Utilization of this service will necessitate a short haul of about one-half mile and additional handling. Petitioner contends that in addition to the difficulty of obtaining trucking service, the additional cost could not be absorbed because of ceiling prices and their existing contracts. For these reasons it is contended that it would be economically impossible for petitioner to continue in business ......

"For petitioner to continue to receive service over this branch line, the only portion of the tracks that could be removed, would be along Oregon Avenue; the trackage that could be eliminated on Twenty-third Street would be inconsequential and crossings at grade would only be eliminated along Oregon Avenue ...... The very purpose of the project, viz., to provide *safe* and adequate streets and highways in a rapidly developing section of the city for the accommodation, convenience and safety of the general public, to meet the needs of the day, would be defeated.

"As early as March 13, 1941, the petitioner was notified by The Baltimore and Ohio Railroad Company of its intention to abandon the branch line. Petitioner was notified of the filing of the application and of a hearing at which time a temporary order was issued. A hearing was fixed for June 24, 1942, of which petitioner had notice, but did not appear nor was any testimony introduced on its behalf. Not until six (6) days

after service of the order of July 1, 1942, did Crown Products Company file the instant petition for modification. Petitioner's method of procedure is not indicative of a protestant irreparably damaged ......

"The contemplated improvements are in the interest of the general public. These improvements certainly do not benefit the railroads; they are to relinquish franchises, share a part of the expense of the removal of tracks and will have to detour their freight temporarily over the tracks of the Pennsylvania Railroad. The County Commissioners, the City and the State Highway Department, in the reasonable exercise of their police powers, have determined that it is necessary to eliminate the trackage in dispute, in order to carry out the general plan in the interest of public necessity. We are of the opinion that the single user of the service should not be permitted to stand in the way of a project designed to immeasurably benefit the general public. Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission, 139 Pa. Superior Ct. 529, 538.

"Accordingly, after a careful review of the entire record, the exhibits and testimony introduced at the hearings on June 24, 1942, and September 14, 1942, and having given full consideration to the issues and matters involved, we are of the opinion and we so find and determine that this project is in the interest of the general public; that public necessity, convenience and safety dictates the denial of the prayer of the petition of the Crown Products Company."

Our review of the record leads us to the same conclusion. The appellant took a lease of its manufacturing plant with full knowledge—if it made any inquiry or examination—that the City had planned and was contemplating the ultimate elimination of the tracks by which railroad car service delivery was made to its loading platform, and the abolition of the grade cross-

ings intersecting the railroad tracks. If it has any legal right to damages growing out of the abolition of these grade crossings it is not deprived of that right by this order. If it has no such legal right, its individual *'damnum absque injuria'* should not be permitted to hazard the postponement and perhaps defeat the accomplishment of this improvement, so important for the safety and accommodation of the public. The United States Government has not objected to the improvement because of any injury to the war work resulting from interference with appellant's war contracts. On the contrary, the United States authorities are collaborating in the improvement, and are contributing to its accomplishment. If the removal of the tracks results in monetary loss to appellant on its war contracts, authority may be obtained to re-negotiate its contracts, in circumstances due to no fault of the contractor. The owner of the leased real estate has not joined in the petition for modification. Appellant's suggestion that in awarding damages to the abutting land owners, when the railroad was constructed in 1885-86, consideration was given to the benefits likely to ensue from the *service* of the railroad, (see, inter alia, *Schuylkill River E. S. R. R. Co. v. Stocker*, 128 Pa. 233, 18 A. 399; *Kersey v. Schuylkill River E. S. R. R. Co.*, 133 Pa. 234, 19 A. 553; *Rees v. Schuylkill River E. S. R. R. Co.*, 135 Pa. 629, 20 A. 148) would not apply to this appellant, whose *tenancy* arose some fifty years later.

We found no such error in the action of the Commission as would lead us to reverse its order.

For the foregoing reasons, the appeal was dismissed and the order of the Commission affirmed.